NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re PHILIPS/MAGNAVOX TELEVISION LITIGATION | Civil Action No.: 09-3072 (PGS)<br><br>OPINION |

      This is a putative class action brought on behalf of purchasers of certain plasma and liquid crystal display flat screen televisions manufactured by Philips Electronics North America Corporation ("Philips") and Funai Corporation, Inc. ("Funai") (collectively, "Defendants"). Plaintiffs allege that since June 24, 2003 through the present (the "Class Period") Defendants have concealed a design defect in their televisions, which causes the televisions to overheat and eventually become inoperable. Currently before the Court are Defendants' motions to dismiss Plaintiffs' consolidated class action complaint. For the following reasons, Philips's motion to dismiss is granted in part and denied in part, and Funai's motion to dismiss is granted.

      **I.    BACKGROUND**

      The televisions at issue are sold under the Philips and Magnavox brand names (collectively, "Philips/Magnavox televisions"). (Consol. Compl. ¶ 1.) The alleged defect in Philips/Magnavox televisions involves electrolytic capacitors, which Plaintiffs describe as devices that store electrical charges and serve as "energy storage centers." (*Id.* ¶¶ 40, 42.) Capacitors "help smooth voltage

spikes that are caused by lightening or electrical switches opening and closing," and allow "a steady stream of current to be supplied to circuits inside a television." (*Id.* ¶ 42.) The life of a capacitor is influenced by a number of factors, including overvoltage or heat. (*Id.* ¶ 44.) In Plaintiffs' estimation, "a good rule of thumb is that every 10 degree Celsius over 85 degrees will cut the life expectancy of an electrolytic capacitor in half." (*Id.* ¶ 56.)

Plaintiffs allege that the capacitors in Philips and Funai televisions are defective because they are exposed to "excessive heat and/or excessive voltage." (*Id.* ¶ 54.)[1] This problem in turn "causes the capacitors to fail," automatically shutting down the television. (*Id.* ¶¶ 2, 54, 57.) When a Philips television shuts down due to an overheated capacitor, the viewer is prompted by "a number of blinking red lights on the front panel of the TV." (*Id.* ¶ 57.) These red lights are "commonly referred to in consumer complaints as the 'red blinking light problem' or the 'blinking lights of death.'" (*Id.*) As a temporary fix, some owners "have been able to resume use of their television by unplugging the unit, waiting 20-30 seconds for the capacitors to cool, and then plugging it back in." (*Id.*) However, this solution is temporary because the capacitors "eventually burn out," leaving the television completely inoperable. (*Id.*; *see also id.* ¶¶ 58-59 (pictures of blow capacitors).) Plaintiffs allege that the capacitors burn out well in advance of the televisions' expected life span, which Plaintiffs claim is "60,000 to 100,000 hours, or about 8 hours of daily viewing for 20 years." (*Id.* ¶ 35.)

Given these and other problems with plasma and LCD televisions, "industry buying guides" cited by Plaintiffs "absolutely" recommend purchasing an extended warranty. (*Id.* ¶ 35 n.3, lcdtvbuyingguide.com ("LCD Buying Guide").) Indeed, according to the Extended Warranty section

---

[1] Plaintiffs refer to the capacitor defect as the "TV Problem." (*Id.* ¶ 2.)

of LCD Buying Guide:

> You need to realize, though, that a lot can happen to LCD displays after a year of use. There might have been sufficient time for all the defective pixels to have turned-up, but other things can go wrong, too. Like your backlight dimming prematurely . . . or your tuner malfunctioning . . . or your power supply acting irregularly. You can hope that any "bugs" in your LCD TV become apparent while it's still under the manufacturers warranty. Or you can purchase an extended warranty in case they do not.

(*Id.*)  These industry buying guides also provide consumers with information on other warranty options, including purchasing models that come with longer manufacturer warranties or extended third party warranties.  (*Id.*)

Philips has allegedly known of the defect with its capacitors since as early as 2003 for at least five reasons.  (*Id.* ¶ 63.)  First, according to Plaintiffs, before Philips began marketing and selling its flat screen televisions, it experienced the same problem with its traditional "cathode ray tube" televisions manufactured before June 2004.  (*Id.* ¶ 65.)  Second, as early as 2005, Philips's customer support call center, which was outsourced to Computer Generated Solutions, Inc. ("CGS"), began receiving "thousands" of complaints from customers regarding the "red blinking light problem."  (*Id.* ¶¶ 66-67, 70.)[2]  CGS personnel allegedly referred to Philips/Magnavox televisions as "PT bombs" because it was only a matter of time before the capacitor would fail.  (*Id.* ¶ 67.)  Third, customers have posted complaints on consumer forum Web sites such as techlore.com, CNET.com, and consumeraffairs.com, warning prospective purchasers, and placing Defendants on notice.  For example, one such customer described the "red blinking light problem" as follows:

> When the unit is plugged in the red "standby" LED comes on as usual.  I power on the unite from the remote and the power LED turns

---

[2] In late 2008, Funai began operating Philips's call center.  (*Id.* ¶ 66.)

> green I hear two clicks from two relays on the power board (about a second apart) and the 6 cooling fans come on to full power. After approx [*sic*] 2 seconds I get another relay on the power board that clicks on and off one time very quickly along with a very brief flash on the screen. Afterwards the fans power down and I hear the original 2 power relays click off (again about a second part) followed by the red power led flashing once a second.

(*Id.* ¶ 62 (emphasis omitted).) Fourth, Philips/Magnavox televisions create error codes by the manner in which the red lights flash on the front of the control panel. (*Id.* ¶ 71.) These error codes are used by technicians to confirm that a defective capacitor is often the source a problem. (*Id.*) Plaintiffs suggest that as many as 70% to 80% of Philips-related complaints received by CRT involve defective capacitors found in Philips/Magnavox televisions. (*Id.* ¶¶ 72, 81.) Finally, Plaintiffs allege that Philips technicians notified company management about the problem, prompting "a lot of meetings.'" (*Id.* ¶ 84.) Company-wide e-mails would then be sent describing the specific model numbers and problems with Philips/Magnavox televisions. (*Id.*)

Faced with mounting consumer complaints, Philips allegedly took a number of proactive remedial measures to fix the capacitor defect. For instance, Philips switched its manufacturing facilities in 2006 from Singapore to Mexico with the intent of improving quality control. (*Id.* ¶ 73.) Philips also had CRT "create a 'Platinum Team' of 'elite' Philips [t]echnicians charged with addressing [] customer complaints. (*Id.* ¶ 76.) And Philips technicians developed a series of "firmware updates" that customers could download to prevent "intermittent video loss." (*Id.* ¶¶ 77-81.) However, none of these measures effectively resolved the alleged defect. (*See id.* ¶¶ 76, 78.)

Nonetheless, Defendants have allegedly refused to inform the public or issue a recall. (*Id.* ¶¶ 88-89.) Defendants have also refused to repair or replace defective televisions that become inoperable outside of the terms of the express warranty. (*Id.*) On the contrary, Philips allegedly

continues to advertise (or at least create the expectation) that Philips/Magnavox televisions have a "[l]ong expected panel lifetime of over 60,000 hours." (*Id.* ¶ 35.) Consequently, when the televisions fail, consumers are left with the choice of either purchasing a new television or paying a service technician $110 to $150 to perform a diagnostic check and an additional $70 to $90 an hour for repairs performed. (*Id.* ¶ 60.) Not surprisingly, consumers who are allegedly unaware of the pitfalls of owning a Philips/Magnavox television are particularly unhappy with these alternatives, and have posted their complaints online. For example, two customers complained as follows about Defendants' warranty practice:

> I bought a 42 inch LCD Philips TV just last November 2007 and exactly [a] year later the picture suddenly went black. All they can tell me is that it's out of warranty.
>
> \* \* \*
>
> My husband and I purchased a 42" Phillips plasma TV from Brandsmart in 2007 for $1,700. In Aug of 2008, the TV started blinking a red light approximately 7 times. Warranty was expired and Philips would not give any info because no warranty. NEVER BUY ANY PHILIPS PRODUCTS EVER unless you like giving away your money.

(*Id.* (some emphasis omitted).)

In addition to online complaints, consumers have also filed lawsuits. On June 24, 2009, plaintiff Pamela Carter, a Florida resident, filed the first of at least five complaints against Philips and Funai (the "Carter Action"). (ECF No. 1.) According to her complaint, in or about March 2007, Carter purchased a 37-inch Philips television for approximately $800. (Consol. Compl. ¶ 13.) Nearly two years later, however, her television "ceased to function as a result of the TV Problem." (*Id.*) Carter contacted Defendants by telephone to report the problem, but was told to take the

5

product to a repair technician. (*Id.*) On or about January 12, 2009, Carter informed Defendants that the repairs were estimated to be $450 to $650, and demanded Defendants repair or replace her allegedly defective television. (*Id.*) Nonetheless, Defendants responded that, because her 90-day warranty on labor and one year warranty on parts had elapsed, "Defendants would not pay for repairs, nor replace her TV." (*Id.*)

On November 30, 2009, the Court consolidated the Carter Action with four other lawsuits filed against Philips and Funai. (ECF No. 33.) Thereafter, on December 30, 2009, Plaintiffs filed a consolidated complaint naming fourteen Plaintiffs -- Mark Mancinelli, Mike Tejada, Doug Seitsinger, Pamela Carter, Phyllis Juried, Frank St. Angel, Joseph Hennessey, Donald Umble, Bill Bray, Al Margrif, Kathy Rock, Michael Youngblood, Lisa Sanders, and Deanna Marshall -- and alleging twenty-eight separate causes of action under eleven different states' laws.

Plaintiffs' claims are roughly grouped by the parties into three categories: (1) breach of implied warranty of merchantability (counts two, five, nine, eleven, sixteen, twenty-one, twenty-six, and twenty-eight); (2) consumer fraud (counts one, four, seven, eight, ten, thirteen, fourteen, eighteen, twenty, twenty-three, and twenty-five); and (3) unjust enrichment (counts three, six, twelve, fifteen, seventeen, twenty-two, twenty-four, and twenty-seven).[3] Each Plaintiffs' allegations are factually similar. Like Carter, all of the named Plaintiffs purchased a Philips television that has allegedly "ceased to function as a result of the TV Problem" after the expiration of the warranty.

---

[3] Plaintiffs also include an Ohio common law claim for negligent design/failure to warn (count nineteen). Defendants seek to dismiss this claim as abrogated by Ohio's Product Liability Act (Philips Br. at 62-63) even thought they concede that the court in *In re Whirlpool Corp. Front-Loading Washer Prods. Liability Litig.*, 684 F. Supp. 2d 942, 950 (N.D. Ohio 2009) held otherwise. However, to the extent Ohio law remains unsettled, Defendants may renew their abrogation argument on summary judgment.

(Consol. Compl. ¶ 10.)  The only notable distinction for purposes of the present motions concerns Deanna Marshall.  Marshall, a Montana resident, asserts claims for consumer fraud under New Jersey law (count one) and breach of implied warranty of merchantability under Montana law (count twenty-eight).  Marshall's allegations are distinct because she is the only Plaintiff to purchase a television after Funai entered into a brand licensing agreement with Philips.  The brand licensing agreement permits Funai to "manufacture, distribute, market, sell and provide customer service" Philips/Magnavox televisions after September 2008.  (*Id.* ¶ 28.)

Defendants now move to dismiss Plaintiffs' consolidated complaint.

## II.   STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court is required to accept as true all allegations in the complaint and to view the facts in a light most favorable to the non-moving party.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim. *Iqbal*, 129 S. Ct. at 1950.  A court will not, however, accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *Iqbal*, 129 S. Ct. at 1949.  The Supreme Court has recently held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements." *Twombly*, 550 U.S. at 555.  In other words, "factual allegations must be enough to raise a right to relief above the speculative level." *Id.*

### III.     DISCUSSION

#### A.     Breach of Implied Warranty of Merchantability

The first category of claims alleged by Plaintiffs is breach of implied warranty of merchantability. Generally, an implied warranty of merchantability requires that the goods at issue are fit for the ordinary purposes for which they are used. N.J.S.A. 12A:2-314; 67A Am. Jur. 2d Sales § 689 (2010) ("Under the implied warranty of merchantability, the seller warrants that the goods are 'fit for the ordinary purposes for which such goods are used.'"). Plaintiffs allege that Philips's televisions violate this implied warranty because they contain a latent "design defect," which causes them to overheat and become inoperable well before their expected lifespan. (Consol. Compl. ¶ 2.)

Defendants seek dismissal of Plaintiffs' implied warranty claims because the parties relationship is governed exclusively by the express time-limited warranty issued by Defendants. Ordinarily, where an express time-limited warranty is issued by a manufacturer, "'latent defects discovered after the term of the warranty are not actionable'" as an implied warranty claim. *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 616 (3d Cir. 1995). "[C]ase law almost uniformly holds that time-limited warranties do not protect buyers against hidden defects-defects that may exist before, but typically are not discovered until after[] the expiration of the warranty period." *Abraham v. Volkswagen of Am., Inc.*, 795 F.2d 238, 250 (2d Cir. 1986) (internal quotations omitted; alteration in original); *accord McCalley v. Samsung Elecs. Am., Inc.*, 2008 WL 878402, at *7 (D.N.J. March 31, 2008) (Plaintiff cannot "rely on the implied warranties of merchantability and fitness for a particular purposes to recover damages[] where the contract's one-year express warranty had expired at the time of the loss.") (internal quotations omitted).

8

Nonetheless, under limited circumstances, an implied warranty claim can be brought where the express warranty offered is unconscionable. *Id.* at *6 n.4 (citing *Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 296 (4th Cir. 1989)) (other citations omitted). Unconscionability comes in two forms: procedural and substantive. Procedural unconscionability "'can include a variety of inadequacies, such as age, literacy, lack of sophistication, hidden or unduly complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process.'" *Payne v. Fujifilm U.S.A., Inc.*, Civil Action No. 07-385(JAG), 2007 WL 4591281, at *4 (D.N.J. Dec. 28, 2007) (quoting *Sitogum Holdings, Inc. v. Ropes*, 352 N.J. Super. 555, 564 (Ch. Div. 2002)). Substantive unconscionability "suggests the exchange of obligations so one-sided as to shock the court's conscience." *Id.*

Plaintiffs' implied warranty claim fails because Defendants' express one-year warranties are not procedurally or substantively unconscionable. Plaintiffs have failed to allege procedural unconscionability because there are no alleged inadequacies in bargaining power or buyer sophistication. Rather, Plaintiffs' complaint cites to an LCD Buying Guide[4] informing consumers of a wide array of warranty options, including purchasing models that come with lengthier manufacturers warranties or third-party extended warranties. (*See* Consol. Compl. ¶ 35 n.3 (citing LCD Buying Guide).) *Compare In re Samsung DLP Television Class Litig.*, Civ. No. 07-2141 (GEB), 2009 WL 3584352, at *5 (D.N.J. Oct. 27, 2009) (class members alleged to have "no meaningful choice" in determining time limitations of express warranty); *Payne*, 2007 WL 4591281, at *5 (same). Indeed, the Extended Warranty section of LCD Buying Guide cited by Plaintiffs

---

[4] The Court can consider the LCD Buying Guide on a motion to dismiss because Plaintiffs have cited to the Web site in their complaint. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

"absolutely" recommends an extended warranty. (*Id.*) Thus, Plaintiffs' ability to purchase either other television brands with different warranties or extended warranties on Philips/Magnavox televisions defeats their allegations of procedural unconscionability.

Plaintiffs also fail to allege substantive unconscionability. There are no allegations that Philips warranties are unfair compared to other warranties in the television industry, let alone rise to the substantial level of "conscious shocking." *Sitogum Holdings*, 352 N.J. Super. at 564. According to Plaintiffs' LCD Buying Guide, "off brand" televisions can come with a more "stingy" 90-day warranty. (*Id.*) A 90-day warranty is substantially less than the one-year warranty offered by Philips for parts. (*Compare id. with* Consol. Compl. ¶ 5.) Thus, Plaintiffs' breach of implied warranty claims are dismissed.

### B. Consumer Fraud

The second category of claims alleged by Plaintiffs is violations of state consumer protection statutes. Specifically, Plaintiffs allege violations of the New Jersey Consumer Fraud Act, the California Consumer Legal Remedies Act, the California Unfair Competition Law, the Texas Deceptive Trade Practices Act, the Illinois Consumer Fraud and Deceptive Business Practices Act, the Ohio Consumer Sales Practice Act, the Michigan Consumer Protection Act, the Florida Deceptive and Unfair Trade Practices Act, the Washington Consumer Protection Act, and the Arkansas Deceptive Trade Practices Act. Although these statutes have different substantive requirements, collectively, they are intended to broadly prohibit unconscionable or immoral commercial practices, and fraud and deception through misrepresentations or intentional omissions of material facts. *See* N.J.S.A. 56:8-2; Tex. Bus. & Com. §§ 17.46(a); Cal. Civ. Code § 1770(a); Ark Code Ann. § 4-88-107.

Like Plaintiffs' implied warranty claims, Defendants seek dismissal of Plaintiffs' consumer fraud claims because the televisions' express warranty should govern. In Defendants' view, consumer protection statutes cannot be used as an end-run around well settled warranty law. (Philips Br. at 33-34.) Indeed, numerous courts have recognized that permitting consumer fraud claims where a product outperforms the warranty period "would essentially compel manufacturers and sellers to warrant their products and component parts beyond that to which the parties expressly agreed." *Perkins v. DaimlerChrysler Corp.*, 383 N.J. Super. 99, 113 (App. Div. 2006); *accord Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964, 969 (N.D. Cal. 2008) ("A contrary holding would eliminate term limits on warranties, effectively making them perpetual or at least for the 'useful life' of the product."), *aff'd*, 322 F. App'x 489 (9th Cir. 2009); *Noble v. Porsche Cars N. Am., Inc.*, 694 F. Supp. 2d 333, 338-39 (D.N.J. 2010); *Duffy v. Samsung Elec. Am., Inc.*, No. CIV.06-5259 (DRD), 2007 WL 703197, at *8 (D.N.J. March 2, 2007); *see also* Tex. Bus. & Com. §§ 17.44(b)(20) ("[N]othing in [the statute] shall be construed to expand the implied warranty of merchantability . . . to involve obligations in excess of those which are appropriate to the goods.").[5]

However, a warranty defense is generally unavailable where there are allegations of intentional concealment of a product defect. *See Maniscalco v. Brother Int'l Corp.*, 627 F. Supp. 2d 494, 501-02 (D.N.J. 2009); *Henderson*, 2010 WL 2925913, at *6. A warranty defense is also unavailable where a defendant has an obligation of disclosure. *See Hord v. Envtl. Research Inst. of*

---

[5] Defendants also suggest that the express warranty actually serves as an implicit disclosure of possible defects. (Philips Br. at 28-29.) According to Defendants, "an exhaustive disclosure describing each and every characteristic of a consumer product is made irrelevant by th express warranty." (*Id.* at 28 (quoting Richard A. Posner, Economic Analysis of the Law 112 (1992).) However, Plaintiffs' claims involve more than a possible defect; they include allegations that Defendants knew but concealed latent defects. Thus, this is not a "pure omissions" case, as Defendants suggest. (Philips Reply Br. at 10-11.)

*Mich.*, 617 N.W.2d 543, 550 (Mich. 2000) ("In order for the suppression of information to constitute silent fraud there must be a legal or equitable duty of disclosure.") (citing 37 Am Jur 2d, Fraud and Deceit § 146). A duty to disclose can arise where there is a safety concern, a fiduciary relationship, or where an omission is "contrary to a representation actually made by the defendant." *Oestreicher*, 544 F. Supp. 2d at 969; *Baba v. Hewlett-Packard Co.*, No. C 09-05946 RS, 2010 WL 2486353, at *3 (N.D. Cal. June 16, 2010); *see also Bardin v. Daimlerchrysler Corp.*, 39 Cal. Rptr.3d 634, 647 (Cal. App. 2006) (omission actionable even where contrary to the public's "expectation or an assumption" about a product).

Plaintiffs allege that Defendants violated the consumer protection statutes at issue because Defendants failed to disclose and actively concealed the capacitor defect, despite having knowledge of the defect as early as 2003. (Consol. Compl. ¶ 63.) For example, before Philips began marketing and selling its flat screen televisions, it experienced the same problem with its traditional "cathode ray tube" televisions manufactured before June 2004. (*Id.* ¶ 65.) Philips also received "thousands" of complaints from customers regarding the "red blinking light problem." (*Id.* ¶¶ 66-67, 70.) And Philips technicians notified company management about the TV Problem, prompting "a lot of meetings." (*Id.* ¶ 84.) Moreover, contrary to Defendants' omissions, Plaintiffs allege that Philips advertised (or at least created the reasonable expectation) that its televisions would last over 60,000 hours. (*Id.* ¶ 35.) In light of these allegations, it would be inappropriate at this stage of the litigation to dismiss Defendants' consumer fraud claims solely because Defendants provided Plaintiffs with an express warranty.

Defendants also argue that Plaintiffs have failed to plead reliance, causation, or materiality. However, in making these factual arguments, Defendants too closely parse Plaintiffs' individual

12

allegations. On whole, Plaintiffs complaint is fairly detailed and contains sufficient allegations regarding the elements of their consumer fraud claims. Plaintiffs' complaint describes the precise nature of the alleged defect, how and why Defendants had knowledge of the defect, and the individual transactions of each Plaintiff. For instance, various Plaintiffs allege that had they "known Philips/Magnavox Flat Screen TVs were defective, they would not have purchased them." (Consol. Compl. ¶¶ 129, 167, 249, 307, 376, 413.) This sufficient to demonstrate causation. *See McCalley*, 2008 WL 878402, at *7 (holding that allegations that plaintiff "would not have purchased" the product sufficient to plead causation). Moreover, Plaintiffs' allegations regarding reliance (to the extent it is required)[6] and materiality are sufficient at this stage of the litigation. *See In re Tobacco II Cases*, 207 P.3d 20, 39 (Cal. 2009) ("[M]ateriality is generally a question of fact unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it.") (internal quotations omitted).[7] Thus, Philips's motion to dismiss Plaintiffs' consumer fraud claims is denied.

Finally, Funai seeks dismissal of Plaintiffs' consumer fraud claims (with the exception of Deanna Marshall), because no Plaintiff other than Marshall could have, as a factual matter, purchased a television manufactured, marketed, sold, or distributed by Funai. (Funai Br. at 5.) Funai did not enter into a licensing agreement until September 2008, and all Plaintiffs except Marshall

---

[6] Reliance is not required under New Jersey's CFA. *N.J. Citizen Action v. Schering-Plough Corp.*, 367 N.J. Super. 8, 15 (App. Div. 2003). (*See also* Philips Br. at 57-58 (no consensus on whether Ohio Consumer Sales Practices Act requires reliance).)

[7] Defendants further dispute that they advertised the expected life of their televisions to be 60,000 hours. (Philips Br. at 5-6 n.2.) They also assert that any claims Philips made were merely "puffery." (*Id.* at 60.) However, these arguments may be more appropriate on summary judgment.

purchased their televisions before that date. (Consol. Compl. ¶¶ 28, 121-122.) Marshall is alleged to have purchased her television in or about October 2008. (*Id.* ¶ 23.)

Plaintiffs do not dispute Funai's factual argument. Instead, Plaintiffs merely contend that dismissal of Plaintiffs' claims against Funai is premature because discovery will demonstrate Funai's liability pursuant to its brand licensing agreement with Philips. (Pls'. Funai Opp. Br. at 16.) However, Plaintiffs' argument -- what Funai characterizes as "shoot first, then aim" -- runs contrary to the pleading requirements of Rule 8 of the Federal Rules of Civil Procedure. Rule 8 requires "factual allegations . . . to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). There are no factual allegations raising a right to relief above the speculative level because nothing in the complaint demonstrates that Funai is responsible for televisions manufactured, marketed, sold or distributed prior to September 2008. Thus, with the exception of Marshall, Plaintiffs' consumer protection claims against Funai are dismissed. Marshall's CFA claim (count one) is dismissed for other reasons set forth below.

Funai argues that Marshall's New Jersey's CFA claim should be dismissed because Montana's Consumer Protection Act ("CPA") should govern under choice-of-law principles. Funai further assumes that if Montana law governs, the Court must dismiss Marshall's CFA claim. Neither party has addressed the merits of whether Marshall's CFA claim could be construed to state a claim for relief under Montana's CPA. *C.f. Cooper v. Samsung Elecs. of Am., Inc.*, No. 08-4736, 2010 WL 1220946, at *2 (3d Cir. March 30, 2010) (district court *sua sponte* construed New Jersey CFA claim "as if it had been brought under Arizona's consumer fraud statute").

To determine whether New Jersey or Montana law should govern, courts must apply the choice-of-law rules of the forum state -- in this case, New Jersey. *Cooper, Inc.*, 2010 WL 1220946,

14

at *3 (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  "Under New Jersey law, choice-of-law determinations involve a two-step inquiry." *Id.* First, "a determination is made as to whether or not an actual conflict exists between the substance of the laws of each respective potential forum." *Id.* If no actual conflict is found to exist, the inquiry is over and, because New Jersey would apply it own law in such a case, a federal court sitting in diversity must do the same." *Id.* However, if "an actual conflict is found to exist, the inquiry proceeds to the second step." *Id.* Under the second step New Jersey's choice-of-law analysis, a court must "weigh the factors in the Restatement" -- otherwise known as the "most significant relationship test." *Id.* (citing *P.V. v. Camp Jaycee*, 197 N.J. 132 (2008)).

Section 148 of the Restatement (Second) of Conflict of Laws sets forth the "most significant relationship" test as it pertains to fraud actions.  Section 148 states as follows:

> (1) When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.
>
> (2) When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:
>
> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
>
> (b) the place where the plaintiff received the representations,

>    (c) the place where the defendant made the representations,
>
>    (d) the domicil, residence, nationality, place of incorporation and place of business of the parties,
>
>    (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
>
>    (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Under New Jersey's choice-of-law rules, Montana law should govern Marshall's consumer fraud claim. First, it is clear that a conflict exists between New Jersey and Montana law. New Jersey's CFA is by all accounts "one of the strongest consumer protection laws in the nation," *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 14-15 (1994) (internal quotations omitted), and it "not only permits, but also encourages the bringing of private class actions." *Debra F. Fink, D.M.D., MS, PC v. Ricoh Corp.*, 365 N.J. Super. 520, 570 (Law Div. 2003). By comparison, Montana's CPA is arguably more restrictive, and it explicitly bars class actions. *Id.* (citing Mont. Code Ann. § 30-14-133); *accord Ass'n of Unit Owners of Deer Lodge Condo. v. Big Sky of Mont., Inc.*, 798 P.2d 1018, 1028-29 (Mont. 1990) ("The Montana Consumer Protection Act provides . . . that a person who . . . suffers a loss of money or property may bring an action (but not a class action) to recover actual damages, which may be trebled.").

Second, under the factors set forth in subsection 148(2) of the Restatement, Montana, not New Jersey, has the "most significant relationship" to Marshall's claim. Marshall does not dispute that she purchased her television in Montana, or that she received Defendants' representations -- the marketing of the television -- in Montana. Moreover, any contractual performance -- such as the

repair of her television, if it were still under warranty -- would be made in Montana. *Cf. Cooper*, 2010 WL 1220946, at *4 (holding at the motion to dismiss stage that the plaintiff's CFA claim bore "the most significant relationship with Arizona, that state in which the television was marketed, purchased, and used."). Thus, Marshall's New Jersey CFA claim is dismissed. The Court further declines to consider *sua sponte* whether her claim could be construed as if brought under Montana's CPA because neither party has addressed the merits of such a claim.

### C. Unjust Enrichment

The final category of claims alleged by Plaintiffs is unjust enrichment. The doctrine of unjust enrichment rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another. *Assocs. Comm. Corp. v. Wallia*, 211 N.J. Super. 231, 244 (App. Div. 1986). A plaintiff can ordinarily recover under this doctrine where "the defendant 'received a benefit, and that retention of the benefit without payment therefore would be unjust.'" *Id.* (quoting *Callano v. Oakwood Park Homes Corp.*, 91 N.J. Super. 105, 109 (App. Div.1966)); *accord Muehlbauer v. Gen. Motors Corp.*, 431 F. Supp. 2d 847, 852 (N.D. Ill. 2006) (discussing Illinois, California, Rhode Island and Maine law); 26 Williston on Contracts § 68:5 (4th ed. 2010).

However, in many states, unjust enrichment generally requires a "'plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant.'" *Torres-Hernandez v. CVT Prepaid Solutions, Inc.*, Civil Action No. 3:08-cv-1057-FLW, 2008 WL 5381227, at *9 (D.N.J. Dec. 17, 2008) (quoting *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994)). Unjust enrichment is also preempted in certain circumstances. For instance, unjust enrichment cannot succeed where an express contract governs the parties relationship. *Moser v. Milner Hotels, Inc.*, 6 N.J. 278, 280 (1951)) ("It is a well settled rule that an

express contract excludes an implied one. An implied contract cannot exist when there is an existing express contract about the identical subject.") (internal quotations omitted); *accord Strategic Reimbursement, Inc. v. HCA, Inc.*, No. 06 C 6501, 2007 WL 2274709, at *3 (N.D.Ill. (Aug. 2, 2007) ("A contract implied in fact cannot coexist with an express contract when they involve the same subject matter"); 17 C.J.S. Contracts § 7 (2010) ("There can be no claim for unjust enrichment when express contract exists between parties."); *compare Palmeri v. LG Elecs. USA, Inc.*, Civil Action No. 07-5706(JAG), 2008 WL 2945985, at *6 (D.N.J. July 30, 2008) ("At the pleading stage, this Court is not in a position to determine whether the implied contract underlying the unjust enrichment claim and the express contract are about the identical subject.").

Plaintiffs cannot demonstrate that they expected remuneration from Defendants at the time they paid for their Philips/Magnavox televisions. Rather, it was the third-party retailers who had a direct relationship with Plaintiffs and received the benefit of Plaintiffs' sales. *See Maniscalco*, 627 F. Supp. 2d at 506; *Cooper v. Samsung Elecs. Am., Inc.*, Civil Action No. 07-3853, 2008 WL 4513924, at *10 (D.N.J. Sept. 30, 2008), *aff'd*, No. 08-4736, 2010 WL 1220946 (3rd Cir. March 30, 2010); *McCalley*, 2008 WL 878402, at *10. Moreover, to the extent any other states' common law permits an unjust enrichment claim to proceed on a indirect relationship,[8] Plaintiffs' claim still fails because the parties' relationship is governed by an express contract -- the warranties issued by Defendants. *See Moser*, 6 N.J. at 280. Thus, Plaintiffs' unjust enrichment claims are dismissed.

---

[8] *See, e.g., Muehlbauer*, 431 F. Supp. 2d at 853 (Under Illinois law, "unjust enrichment claim may be premised on an indirect conferral of benefits."); *Aladdin Elec. Assocs. v. Town of Old Orchard Beach*, 645 A.2d 1142, 1144 (Me. 1994) ("Lack of privity of contract and failure to perfect a lien do not bar an action for unjust enrichment.").

## IV. CONCLUSION

For the foregoing reasons, Philips's motion to dismiss is granted in part and denied in part, and Funai's motion to dismiss is granted. Counts two, three, five, six, nine, eleven, twelve, fifteen, sixteen, seventeen, twenty-one, twenty-two, twenty-four, twenty-six, twenty-seven, and twenty-eight against Philips are dismissed. All counts against Funai are dismissed.


*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

September 1, 2010